constitutionally deficient was an unreasonable application of the first prong of *Strickland*. That court credited Shirk's articulated trial strategy without discussing either the means Shirk employed in achieving his goal, or whether that goal was reasonable in light of his overall defense strategy, and the majority today compounds that error by repeating it. *Cf. Cone*, 243 F.3d at 978 ("the noun 'strategy' is not an accused lawyer's talisman that necessarily defeats a charge of constitutional ineffectiveness"). Although *Strickland* does require that we indulge a strong presumption that Shirk's conduct was reasonable, *see id.* at 689, in this case the evidence shows that Shirk's strategy was illogically determined and deficiently pursued. Under *Wolfe*, the failure to remove a juror who had a close and ongoing professional relationship with the victim's family and who knew the family's theory of the crime results in a violation of the Sixth Amendment right to an impartial jury. In this case, where the juror in question not only possessed the same deficiencies we deemed dispositive in *Wolfe* but also showed actual bias in the form of a predisposition to reject the entire defense theory, Shirk's failure to protect that right constituted deficient performance. Like the state trial court that heard this habeas claim in the first instance, I would grant Miller's petition.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0366P (6th Cir.)
File Name: 01a0366p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

HENRY C. MILLER,
    *Petitioner-Appellant,*

v.

ROD FRANCIS, Warden,
    *Respondent-Appellee.*

No. 00-3327



Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 99-00257—George C. Smith, District Judge.

Argued: June 12, 2001

Decided and Filed: October 11, 2001

Before: MARTIN, Chief Judge; NORRIS, Circuit Judge;
QUIST, District Judge.[*]

---

## COUNSEL

**ARGUED:** Susan M. Roche, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Jonathan R. Fulkerson,

---

[*] The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Susan M. Roche, David H. Bodiker, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Jonathan R. Fulkerson, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

QUIST, D. J., delivered the opinion of the court, in which NORRIS, J., joined. MARTIN, C. J. (pp. 21-28), delivered a separate dissenting opinion.

———————————

### OPINION

———————————

GORDON J. QUIST, District Judge. Petitioner, Henry C. Miller, is serving a prison sentence imposed after he was convicted of three counts of gross sexual imposition and one count of raping a minor under the age of thirteen. He appeals the district court's dismissal of his § 2254 habeas petition. Miller alleges in his petition that his trial counsel was ineffective for failing to challenge a biased juror and that the state court of appeals improperly applied a *de novo* standard rather than the abuse of discretion standard when it reversed the trial court's decision that he had been denied the effective assistance of counsel. We find that the state court of appeals' rejection of Miller's claim of ineffective assistance of counsel was not an unreasonable application of clearly established federal law as determined by the Supreme Court. Accordingly, we AFFIRM.

### I.

The state prosecution arose from allegations that Miller sexually molested a thirteen-year-old boy that he had befriended. An Ohio grand jury indicted Miller on three counts of gross sexual imposition and three counts of rape of a minor under the age of thirteen. The investigation began when the county Department of "Children's Services" received an anonymous phone call on August 13, 1992,

The majority finds no problem with Furrow and Williamson's prior contact because "Williamson only told Furrow over the phone that her son had been raped and provided no further details." Maj. Op. at 16. Had the defense focused on a claim of mistaken identity or some sort of affirmative defense, Furrow's lack of knowledge about the details of the crime may well have been dispositive in determining that she was not in fact biased by her conversation with Williamson. Here, however, Miller's defense was not that someone else raped Williamson's son, but that *no rape ever occurred*. As the majority acknowledges in its recitation of the facts, Furrow repeatedly made comments during voir dire showing her belief that Williamson's son had in fact been raped: "[Williamson] had called me very upset and said that this had happened. But no names were used. *But I was aware that it had happened.*" Furrow described her conversation with Williamson in the following ways: " So it was just the listening that *this had happened to him and what it was doing to her household*;" " . . . she would not be able to make [a scheduled meeting] for some reason because she said that she, *that this had happened and she's having a very hard time.*" In response to Shirk's question regarding what Williamson told Furrow, Furrow stated, "Just that she was having a very hard time. *[Her son] had been raped, and that she was trying to go through it with him.*" Shirk followed up with, "Did she tell you how she found out [her son] had been raped?" Furrow responded, "No. She didn't go into that. *Just that he had been.*" In other words, Furrow both indicated both that she had formed a belief that Williamson's son had been raped and that she had formed that belief as a direct result of her conversation with Williamson. I simply cannot agree with the majority that the fact the Furrow did not obtain any details about the crime is even relevant, let alone dispositive, in this case where the one piece of information Furrow did obtain, that Williamson's son was touched sexually, was the only issue raised at trial by the defense.

In sum, I believe that the Ohio Court of Appeals's determination that Shirk's performance was not

her on the jury.[2]   For the retaining of a tainted juror to be "reasonable," an attorney must take some steps during voir dire to determine whether the taint will predispose the juror to decide the case in a way beneficial (or at least not harmful) to his or her client.  Here, it was unreasonable for Shirk to purposefully allow a tainted juror to sit without even attempting to use *voir dire* to ascertain whether she would in fact be helpful to his client.  Therefore, even if Shirk was correct in believing that Furrow found Williamson to be generally dishonest, and even if allowing a tainted juror to sit may be a "reasonable strategic choice" in the abstract, and even assuming Williamson's credibility played a part in Shirk's overall trial strategy, it was unreasonable for Shirk not to take the necessary steps to assure that any benefit of the taint would cut in Miller's favor.

### III.

The foregoing demonstrates the bias that I think *Wolfe* requires us to presume upon evidence of both a close, ongoing relationship with the members of a victim's immediate family and a discussion between the potential juror and the family member about the instant crime.  Even without *Wolfe*, however, I would grant Miller's petition because Furrow's statements during her *voir dire* examination conclusively showed a predisposition to reject the entire defense.  In other words, I think Furrow's *voir dire* answers demonstrated actual bias against Miller's defense, and therefore, I cannot agree with the majority that Shirk's decision to leave her on the jury constituted reasonable or even rational trial strategy.

---

[2]Shirk testified at the evidentiary hearing that "I got the impression in talking with her, and I know that she would perhaps bend over backwards to be fair to Henry, or to my client in this case." Nothing in the *voir dire* transcript, however, supports that impression, and Shirk could not recall what gave him the idea that she would labor to be fair to Miller.  It was, therefore, unreasonable for both the Ohio Court of Appeals and the majority to credit that testimony over the *voir dire* transcript, particularly when the trial court that actually heard Shirk's testimony found his assertions incredible.

stating that Miller was "sleeping with" a boy who was staying at his residence.  The anonymous phone caller disclosed that she received the information from Petitioner's wife, Phyllis Miller.  Children's Services contacted Phyllis Miller and obtained additional information about the allegations and the name of the alleged child victim.  The allegations were unknown to the victim's mother, Cordia Williamson, until she was contacted by a Children's Services caseworker in August 1992.  Williamson was called as a witness by the state.  She testified regarding her son's relationship with Miller and his family.  Williamson testified that when she was contacted by Children's Services, the boy initially denied that anything had taken place, but a few days later he admitted that the allegations were true and told her everything.  Williamson did not testify regarding the content of her son's statements.

During *voir dire*, Juror Number Twelve, Patricia Furrow, indicated that she had some prior knowledge of the case by virtue of her employment with the Logan County Department of Human Services, but Furrow did not want to discuss the prior knowledge in open court because she was concerned about violating the "Privacy Act."  The trial court conducted an *in camera* examination of Furrow, attended by the court reporter, the prosecuting attorney, and Miller's attorney, William Shirk.  During the examination, Furrow stated that she was aware of the case because she was currently serving as a welfare (apparently ADC) caseworker to the victim's mother, Cordia Williamson.  Furrow stated that "[Williamson] had called me very upset and said that this had happened.  But no names were used.  But I was aware it had happened."  During the phone conversation, Williamson told Furrow "that she was having a very hard time.  J-- had been raped, and that she was trying to go through it with him."  Williamson did not tell Furrow the details of the rape or the criminal investigation.  Furrow expressed concern that her presence on the jury would be uncomfortable for both her and Williamson.  Furrow was also worried that Williamson would try to telephone her during trial to talk about the case.  She explained, "I guess I just know Cordia.  I know she's going to call me as soon as, if I'm on there, I know she's going to call

me and, you know, be talking about it and those kinds of things just because Cordia's like that. I know Cordia." When asked by the prosecutor whether she could be fair, Furrow responded, "I -- it's tough. I think I could be fair." When later asked by Shirk whether her professional relationship with Williamson lent more credence to the charges against his client, Furrow answered, "No, I don't really think that I would be biased. Just uncomfortable." Furrow indicated that should a problem arise with Williamson as a result of her participation as a juror, Williamson could be reassigned to a new caseworker. Attorney Shirk declined to challenge Furrow for cause or to use a peremptory challenge to remove her from the jury. The defense had two peremptory challenges remaining at the end of jury selection.

On March 24, 1993, the jury, with Furrow acting as foreperson, found Miller guilty of three counts of gross sexual imposition and one count of rape. The trial court sentenced Miller to terms of imprisonment of one year, one-and-a-half years, and two years for the gross sexual imposition convictions, and eight to twenty-five years for the rape conviction. All sentences were set to run consecutively for a total definite term of four-and-a-half years followed by an indefinite term of eight to twenty-five years. Miller's conviction was affirmed by the Ohio Court of Appeals on October 23, 1993.

Thereafter, Miller filed a petition for post-conviction relief with the trial court. For reasons unimportant to this appeal, the original trial judge recused himself. At the evidentiary hearing before the new judge, Miller presented the expert testimony of Don Schumacher, an experienced local criminal defense attorney. Schumacher testified that, in his opinion, Shirk's decision to leave Furrow on the jury was unreasonable under prevailing professional standards. Shirk was the only witness called by the state. Shirk testified that he and Miller discussed whether Furrow should be kept on the jury. According to Shirk, they had formed the opinion that Williamson was prone to exaggerate, was less than truthful, and difficult to deal with. Shirk believed that if Furrow knew

explanation and the majority's opinion, however, is how or why Williamson's credibility was relevant to the defense. Perhaps if Williamson herself had reported the rape or participated in the subsequent investigation, her credibility would have been relevant enough to conceivably effect the prosecution's case. The undisputed facts establish, however, that a third party reported the sexual contact between Miller and Williamson's son, that Williamson learned about the allegations days later during the course of the investigation, and that she knew nothing about, and therefore could not provide evidence of, either the crime or its attendant circumstances. A telling indication of how unimportant Williamson's credibility was to this case is Shirk's utter failure to make it an issue at trial. His entire defense strategy was to challenge Williamson's *son's* credibility, yet Shirk never mentioned even considering Furrow's opinion of the son when he decided to retain her as a juror.

Moreover, even if it was analytically proper to divorce Shirk's professed *voir dire* strategy from his trial strategy, Shirk failed to ask any questions of Furrow during *voir dire* to determine her opinion of Williamson. As the majority recognizes, one of "the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using *voir dire* to identify and ferret out jurors who are biased against the defense." Maj. Op. at 10. It also cites our observation in *Blount* that "[t]he primary purpose of the *voir dire* of jurors is to make possible the empaneling of an impartial jury through questions that permit the intelligent exercise of challenges by counsel." *United States v. Blount*, 479 F.2d 650, 651 (6th Cir. 1973) (citations omitted). Even assuming that it was reasonable for Shirk to choose to attack the credibility of a witness for the prosecution by retaining a juror who had an ongoing professional relationship with the witness (who was also the mother of the victim), had discussed the crime with the witness, and would likely converse with the witness during the trial, I question whether it would have been "reasonable trial strategy" to fail to determine whether Furrow in fact held the opinion of Williamson that he claimed justified leaving

Furrow's statements would be sufficient standing alone, I read *Wolfe* to stand for the proposition that such tentative statements from a juror who is engaged in a close, ongoing relationship with a victim's parent and who has obtained information about the instant crime from that parent will simply not be sufficient to justify the inherent risk seating them will pose to the defendant. I would therefore find that Furrow was so presumptively biased that she simply could not function as the type of neutral juror that Miller is guaranteed by our Constitution.

## II.

Of course, had Shirk articulated some reason for retaining Furrow as a juror in spite of her presumed bias, one which bore a logical relationship to his defense strategy, that would preclude a finding of ineffective assistance. *See Cone v. Bell*, 243 F.3d 961, 978 (6th Cir. 2001) (finding ineffectiveness where counsel's strategy could not logically have achieved professed goal). We must evaluate Shirk's performance from his perspective at the time of *voir dire* and must make every effort to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Here, both *voir dire* and the trial occurred on March 23, 1993. I think it is appropriate in this circumstance to assume that Shirk formulated his defense strategy by the trial date, and to therefore assess his justification for his actions during *voir dire* in light of his overall defense strategy. Shirk testified at the evidentiary hearing that he believed Furrow's familiarity with Williamson meant that she must know that Williamson is a difficult and often dishonest person, that she would be less inclined to credit Williamson's testimony, and that she would therefore be more sympathetic to Miller. Although the state trial court that heard Shirk's testimony found it less than credible and granted Miller's habeas petition, the Ohio Court of Appeals overturned that decision as an abuse of discretion.

The majority now accepts Shirk's testimony as sufficient to show that he retained Furrow as a juror pursuant to a reasonable trial strategy. Notably absent from both Shirk's

Williamson well, she would have the same opinion of her. He testified, "And we thought if she knew her pretty well, she wouldn't particularly give a lot of credence to what she [Williamson] said because that's the way we look at her." Weighing Furrow against other prospective jurors that had not yet been questioned, Shirk thought she would be a good juror. In fact, he perceived her as someone who would "perhaps bend over backwards to be fair to Henry." Shirk could not recall whether he consulted with his client about Furrow before, during, or after the *in camera* interview.

In an affidavit submitted with his post-hearing brief, Miller stated that he was not present during the *in camera* examination of Furrow. Miller further stated that when Shirk returned from the judge's chambers, Miller asked if the juror in question was going to stay. According to Miller, Shirk responded that Furrow "would be good for [him]." There was no further discussion regarding the content of Furrow's statements during the *in camera* examination. Miller contended that he was not aware that Furrow had counseled Williamson or that Williamson had discussed the case with her before trial.

After reviewing the evidence, the trial court concluded that counsel was ineffective for failing to challenge Furrow. Relying on the *voir dire* transcript, the trial court found that Furrow had "a close connection with the alleged victim's family, prior knowledge of the case, mind set concerning the facts of the case [i.e. that the victim had been raped], and inability to state positively that she could be fair and impartial." Notwithstanding the presumption that Shirk acted competently, the trial court found that his failure to discuss these issues more thoroughly with Furrow and to challenge her either for cause or peremptorily, fell below an objective standard of reasonableness. Accordingly, the trial court vacated Miller's convictions and granted a new trial. The State of Ohio appealed the trial court's decision. The Ohio Court of Appeals reversed the decision of the trial court on June 25, 1998, and Miller's conviction and sentence were reinstated. The court of appeals found that Shirk's decision

to leave Furrow on the jury "bore a reasonable relationship to a defense trial strategy." The court of appeals further held that the trial court abused its discretion by not giving due deference to trial counsel's trial tactics. Miller timely appealed to the Ohio Supreme Court, which declined jurisdiction to hear the case and dismissed the appeal on October 7, 1998, as not involving any substantial constitutional question.

Represented by the public defender, Miller filed an application for habeas corpus relief on March 24, 1999, in the United States District Court for the Southern District of Ohio. Miller presented two grounds for relief. First, Miller claimed that his trial counsel was ineffective for failing to remove Furrow from the jury on account of bias. Second, he claimed that the Ohio Court of Appeals improperly applied a *de novo* standard, instead of the more deferential abuse of discretion standard, in reviewing the decision of the trial court. On February 10, 2000, the district court issued an opinion and order denying Miller's claims on the merits and dismissing the action. On habeas review, the district court concluded that the record did not reveal any indication of juror bias, that trial counsel's *voir dire* was not inadequate, and that trial counsel had articulated a reasonable strategic rationale for leaving the juror at issue on the jury. The district court subsequently granted Petitioner's motion for certificate of appealability with regard to two issues: (1) whether the Ohio Court of Appeals unreasonably determined that Miller was not denied the effective assistance of counsel; and (2) whether the Ohio Court of Appeals unreasonably applied the "abuse of discretion" standard of review, thus denying Miller his procedural due process rights.

## II.

We review a district court's legal conclusions in a habeas proceeding *de novo* and its factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). However, "[W]hen the district court's decision in a habeas case is based on a transcript from the petitioner's state court

because of [your relationship as caseworker and client], she can call you with any problem she has?" Furrow responded, "Correct. A lot of people do." J.A. 648. I simply do not agree that the caseworker/client relationship is so distant that a caseworker could vote to acquit the man accused of raping her client's child without being conflicted as a result of her professional responsibilities to her client. At the least, a caseworker must not emotionally harm her client. Moreover, I think it entirely reasonable to conclude that in light of a caseworker's professional obligations to the well-being of her client, it would take more to convince her to vote to acquit her client's child's attacker than it would any other, truly neutral member of the jury. It was exactly this type of actual external conflict, which in practice manifests itself as bias against the defense, that led us to find constitutional error in *Wolfe*. *See also Cuyler v. Sullivan*, 446 U.S. 335 (1980) (approving of a finding of ineffective assistance when attorney has conflict of interest). I see no reason to reach a different outcome here.

The majority acknowledges that "Furrow expressed some discomfort about sitting on the jury" and that she hesitated in responding to some of the questions concerning her ability to be fair and impartial. Maj. Op. at 14-15. Nonetheless, it finds that "we are not compelled to find that Furrow was presumptively or actually biased," because Furrow never expressly stated she could not be fair. Of course, our duty is not to affirm the seating of a juror absent express statements of bias, but rather to ask whether "a juror [swore] that he could set aside any opinion that he might hold and decide the case on the evidence," and whether the juror's protestation of impartiality should have been believed. *Patton*, 467 U.S. at 1036. The majority is correct that Furrow never explicitly stated that she could not be fair. Instead, she said things like, "I – it's tough. I think I could be fair," and "How do I know if bias – I guess I just know Cordia," and "I know she's going to be calling me, you know. I guess I will just listen to both sides." I do not agree with the majority that these tentative statements "cannot necessarily be construed as equivocation" because many jurors would respond similarly when questioned about their ability to be fair. Even assuming

had an ongoing professional relationship with the victim's parents and gave only tentative assurances that he could be a fair and impartial juror. *See id.* We found that the juror should have been dismissed for cause on those grounds. The second juror had a close, ongoing relationship with the victim's parents and knew the parents' theory of their son's death. Even though the juror definitively stated that she could nonetheless remain impartial, we found those statements untenable in light of her connection to the victim's parents and her knowledge of their theory of the crime. *See id.* In doing so, we noted that "[a] court's refusal to excuse a juror will not be upheld simply because the court ultimately elicits from the prospective juror a promise that he will be fair and impartial." *Id.* (internal quotation marks and citation omitted).

Like the relevant tainted *Wolfe* jurors, Furrow was involved in a close and ongoing relationship with Williamson – the victim's mother and a witness for the prosecution. Furrow had discussed the case with Williamson and knew her version of what happened to her son.[1] In addition, Furrow expressed concerns that she would be forced to discuss the case with Williamson during trial. The majority acknowledges Furrow's relationship with Williamson, but states that Furrow did not indicate that she and Williamson shared a "friendship or strong personal bond." *Wolfe* of course does not require that a relationship be personal, only that it be close and ongoing, as Furrow and Williamson's was in this case. Welfare caseworkers counsel their clients on a regular basis. Here, in fact, Shirk asked Furrow why Williamson felt free to discuss her personal problems with Furrow: "And because,

---

[1] The majority attempts to distinguish *Wolfe* factually on the grounds that, here, "Furrow possessed very little knowledge of the case as a result of her prior contact with Williamson." Maj. Op. at 16. In *Wolfe*, we did not discuss the quantum of information each juror had received. Rather we focused on the information's source and subject matter: that it came directly from the victim's parents and that it addressed the crime at issue. The majority's distinction between the amount of information received in this case and that received in *Wolfe* is thus irrelevant.

trial, and the district court thus makes 'no credibility determination or other apparent findings of fact,' the district court's factual findings are reviewed *de novo*." *Wolfe v. Brigano*, 232 F.3d 499, 501 (6th Cir. 2000) (quoting *Moore v. Carlton*, 74 F.3d 689, 691 (6th Cir. 1996)).

Because Miller's habeas petition was filed on March 24, 1999, after the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 ("AEDPA") became effective, the provisions of the AEDPA apply to his case. *See Penry v. Johnson*, 531 U.S. 1003, 121 S. Ct. 1910, 1918 (2001). Pursuant to the AEDPA, an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The United States Supreme Court elaborated upon this standard in its recent decision in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495 (2000). The Court held that in order to justify a grant of habeas corpus relief under this provision of the AEDPA, a federal court must find a violation of law "clearly established" by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision. *Williams*, 529 U.S. at 412, 120 S. Ct. at 1523. The Supreme Court further held that a decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* at 413, 120 S. Ct. at 1523. A state court decision will be deemed an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S. Ct. at 1522. Rather, the application must also be "unreasonable." *Id.* Further, the habeas court should not transform the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the application by the state court was unreasonable. *Id.* at 410, 120 S. Ct. at 1522 (disavowing *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107, 117 S. Ct. 1114 (1997)). Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410, 120 S. Ct. at 1522.[1]

---

[1] The district court decided Miller's case two months before *Williams* was decided; therefore, the district court did not have the benefit of the Supreme Court's decision in deciding this case. In setting forth the standard of review, the district court cited our decision in *Nevers v. Killinger*, 169 F.3d 352 (6th Cir.), *cert. denied*, 527 U.S. 1004, 119 S. Ct. 2340 (1999). In *Nevers* we relied on the Fifth Circuit's "debatable among reasonable jurists" standard in *Drinkard* combined with the First Circuit's standard of "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes," set forth in *O'Brien v. Dubois*, 145 F.3d 16 (1st Cir. 1998). *See Nevers*, 169 F.3d at 361-62. After *Williams* was decided, we acknowledged the Supreme Court's rejection of the "reasonable jurist" standard set forth in *Drinkard* and found that *Nevers* no longer correctly stated the law on the issue of the appropriate standard under 28 U.S.C. § 2254(d). *See Harris v. Stovall*, 212 F.3d 940, 942-43 (6th Cir. 2000), *cert. denied*, 121 S. Ct. 1415 (2001). In *Harris*, this Court announced, "We must therefore rely solely on the Supreme Court's decision in *Williams* for the appropriate standard under § 2254(d)." *Id.* at 943.

---

**DISSENT**

---

BOYCE F. MARTIN, JR., Chief Judge, dissenting. The majority today affirms as "reasonable trial strategy" a defense attorney's decision to retain a juror who demonstrated both a presumed and an actual bias against the defense during her *voir dire* examination. Even assuming such conduct could be considered reasonable strategy in the abstract, it certainly was not here, where Attorney Shirk's articulated justification for failing to excuse Furrow from the petit jury bears no logical connection to his defense strategy. Because I believe that the majority opinion unreasonably applies *Strickland* by divorcing Shirk's professed strategy during *voir dire* from his defense theory, I respectfully dissent.

I.

*Wolfe* dealt with presumed bias, and I would have no trouble presuming bias on the part of Furrow in light of her relationship with Williamson, her previous discussion of the case with Williamson, her insistence that Williamson would attempt to discuss the case with her during the trial, her clear discomfort with sitting on the jury, and her inability to give an unqualified guarantee that she could be a fair and impartial juror. The right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). In determining whether a juror meets this standard, we must ask, "did a juror swear that he could set aside any opinion that he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed?" *See Patton v. Yount*, 467 U.S. 1025, 1036 (1984). In *Wolfe*, we granted a habeas petition partly on the grounds that the trial court's refusal to dismiss for cause two jurors who had "close and ongoing" relationships with the victim's parents violated the defendant's Sixth Amendment right to an impartial jury. *See Wolfe*, 232 F.3d at 502. The first juror

precedent vesting him with a procedural due process right to a particular standard of appellate review in the state courts. Moreover, we find the error, if any, did not result in the denial of fundamental fairness.

## V.

For the foregoing reasons, the district court's denial of a writ of habeas corpus is AFFIRMED.

## III.

The threshold inquiry under the AEDPA is whether Miller seeks to apply a rule of law that was clearly established at the time his conviction became final in the state court. *See Williams*, 529 U.S. at 390, 120 S. Ct. at 1511. There is no doubt that the merits of Miller's claim of ineffective assistance of counsel are governed by the Supreme Court's holding in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). That the *Strickland* test requires a case-by-case review of the evidence, "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by this Court." *Williams*, 529 U.S. at 391, 120 S. Ct. at 1512.

In *Strickland*, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. 466 U.S. at 688, 104 S. Ct. at 2064. "With regard to the performance prong of the inquiry, . . . [j]udicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir.) (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065), *cert. denied*, 121 S. Ct. 623 (2000). A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *see also Cobb v. Perini*, 832 F.2d 342, 347 (6th Cir. 1987). The petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Second, even if counsel's performance is found deficient, a petitioner must show that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 692, 104 S. Ct. 2067.

Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using *voir dire* to identify and ferret out jurors who are biased against the defense. The Sixth and Fourteenth Amendments to the Constitution guarantee a criminal defendant the right to be tried by impartial and unbiased jurors. *See Morgan v. Illinois*, 504 U.S. 719, 112 S. Ct. 2222 (1992). "The primary purpose of the *voir dire* of jurors is to make possible the empanelling of an impartial jury through questions that permit the intelligent exercise of challenges by counsel." *United States v. Blount*, 479 F.2d 650, 651 (6th Cir. 1973) (citing Wright, 2 Federal Practice and Procedure, ¶ 382 (1969)); *see also Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S. Ct. 1629, 1634 (1981) ("*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored."); *Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S. Ct. 1899, 1908 (1991) (*voir dire* "serves the dual purpose of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges").

Counsel's actions during *voir dire* are presumed to be matters of trial strategy. *See Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001); *Fox v. Ward*, 200 F.3d 1286, 1295 (10th Cir.), *cert. denied*, 121 S. Ct. 329 (2000); *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995). "A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Hughes*, 258 F.3d at 457. Despite the strong presumption that defense counsel's decisions are guided by sound trial strategy, it is not sufficient for counsel to merely articulate a reason for an act or omission alleged to constitute ineffective assistance of counsel. The trial strategy itself must be objectively reasonable. *See Strickland*, 466 U.S. at 681, 104 S. Ct. at 2061. This Court recently stated:

[T]he noun "strategy" is not an accused lawyer's talisman that necessarily defeats a charge of constitutional

Under the unique facts of this case, we cannot say that the decision of the Ohio Court of Appeals was an unreasonable application of *Strickland*. Shirk left Furrow on the jury because he believed that she would have a poor opinion of Williamson and would discount her testimony. Shirk also expressed concern about expending his peremptory challenges when there were other potential jurors who had not been fully questioned. Accordingly, Shirk provided a plausible explanation for his decision. While we may find Shirk's decision to leave Furrow on the jury to be risky or ill-advised, criminal defense lawyers should be given broad discretion in making decisions during *voir dire*. Few decisions at trial are as subjective or prone to individual attorney strategy as juror *voir dire*, where decisions are often made on the basis of intangible factors. Nor may we substitute our judgment for that of the state appellate court. "A state adjudication is not 'unreasonable' 'simply because [the federal] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Staley v. Jones*, 239 F.3d 769, 775 (6th Cir. 2001) (quoting *Williams*, 529 U.S. at 411, 120 S. Ct. at 1522) (alteration in original). Miller's challenge to the state appellate court's decision under the *Strickland* test does not reach the high threshold established by the AEDPA for the granting of habeas corpus relief.

IV.

Miller also asserts that his due process rights were violated because the state appellate court failed to review the trial court's grant of his motion for post-conviction relief under the appropriate "abuse of discretion" standard, but rather engaged in *de novo* review. As the district court observed, a federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41, 104 S. Ct. 871, 875 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988). Habeas relief will only be granted where the error results in the denial of fundamental fairness. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). Miller does not cite, nor are we aware of, any Supreme Court

who was convicted of capital murder, was denied the effective assistance of counsel in the sentencing phase of the criminal proceedings when his counsel failed to introduce available mitigating evidence. First, the United States Supreme Court found that the trial court had properly applied *Strickland*, whereas the state supreme court had "mischaracterized at best" the prejudice prong of the *Strickland* standard. *Williams*, 529 U.S. at 391, 397, 120 S. Ct. at 1512, 1515. The state supreme court erred in holding that *Lockhart v. Fretwell*, 506 U.S. 364, 113 S. Ct. 838 (1993), had modified the rule set forth in *Strickland*. *Williams*, 529 U.S. at 391, 397, 120 S. Ct. at 1512, 1515. Therefore, the state supreme court's decision was contrary to *Strickland*. Second, the *Williams* Court found that the state supreme court's prejudice determination was unreasonable because it failed to consider the "totality of the available mitigating evidence" in weighing it against the evidence of aggravation presented by the prosecutor. *Id.* at 397, 120 S. Ct. 1515.

Contrary to Miller's assertions, both the state trial and appellate courts properly applied the *Strickland* standard in this case. The two courts simply reached different conclusions based upon the evidence. Furthermore, the state court of appeals did not fail to consider the "totality of the evidence" as Miller argues. Miller claims, for example, that the appellate court ignored the testimony of the legal defense expert who concluded that counsel was ineffective. In its opinion, however, the state appellate court recounted the pertinent facts from the trial *voir dire*, as well as the hearing on Miller's motion for post-conviction relief. The court specifically mentioned each of the witnesses at the hearing, including the "legal defense expert who stated that in his expert opinion, defense counsel's failure to challenge Ms. Furrow qualified as ineffective assistance of counsel." The appellate court was certainly not bound by the witness' opinion but was free to reach its own conclusion on the issue of ineffectiveness. Accordingly, neither of the errors present in *Williams* was present in this case.

ineffectiveness. The strategy, which means "a plan, method, or series of maneuvers or stratagems for obtaining a specific goal or result," Random House Dictionary 1298 (Rev.ed.1975), must be reasonable. It need not be particularly intelligent or even one most lawyers would adopt, but it must be within the range of logical choices an ordinarily competent attorney . . . would assess as reasonable to achieve a "specific goal."

*Cone v. Bell*, 243 F.3d 961, 978 (6th Cir. 2001); *see also Washington v. Hofbauer*, 228 F.3d 689, 704 (6th Cir. 2000) (court must assess whether the strategy itself was constitutionally deficient).

The Ohio Court of Appeals found that Miller had not been denied the effective assistance of counsel because Shirk's decision to leave Furrow on the jury "bore a reasonable relationship to a defense trial strategy." The state court of appeals relied in part upon Shirk's testimony at the post-conviction hearing, where he explained his reasons for leaving Furrow on the jury. Shirk testified that Williamson had a reputation for being less than truthful and difficult to deal with. He believed that Furrow likely held the same opinion of Williamson, and, thus, would not consider her to be credible. Because of Furrow's demeanor and responses during *voir dire*, Shirk perceived her as someone who would "bend over backwards" to be fair to his client. Shirk also explained that, in determining whether to use a peremptory challenge, he had to weigh Furrow against other prospective jurors that had not yet been questioned. While the dissent argues that Shirk's decision would have been better supported if he had asked Furrow her opinion of Williamson, a response that was favorable to the defense would likely have prompted the prosecutor to remove Furrow from the jury.

Because Miller's claim of ineffective assistance of counsel is founded upon a claim that counsel failed to strike a biased juror, Miller must show that the juror was actually biased against him. *Hughes*, 258 F.3d at 458. Miller has failed to meet his burden. Furrow's prior knowledge of the case was

not extensive or detailed. Furrow indicated during *voir dire* that Williamson told her over the phone that her son had been raped, but did not disclose the name of the suspect or any details of the event or the investigation. Furrow agreed that she would not necessarily assume that what Williamson told her was true and that she could base her judgment on the evidence presented at trial. Jurors need not be totally ignorant of the facts and issues involved in the case. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642 (1961). "[I]t is beyond question that mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint; such a standard would be certainly unsalutary, and likewise impossible to achieve . . . . " *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998). Furthermore, while Furrow served as Williamson's welfare caseworker, there is no indication from the record that they shared a close personal relationship.

This case can be distinguished from two other cases recently decided by this Court. In *Hughes*, 258 F.3d 453, the petitioner similarly claimed that his trial counsel was ineffective for failing to remove a biased juror. During *voir dire*, the judge asked the potential jurors whether they thought they could be fair. One of the jurors responded that she had a nephew and a couple of friends on the police force with whom she was quite close. *Hughes*, 258 F.3d at 456. When the court asked the juror if those relationships would prevent her from being fair in the case, she responded, "I don't think I could be fair." *Id.* We held that, while a juror's express doubt as to her ability to be impartial on *voir dire* does not necessarily result in a finding of actual bias, actual bias was present in that case because neither counsel nor the trial court responded to the juror's express statement that she could not be fair. *Id.* at 458-59. Neither counsel nor the trial court asked follow-up questions directed toward rehabilitating the juror or obtaining assurances of impartiality. Because the only evidence relevant to the issue of bias was the juror's statement that she did not think she could be fair, we had no choice but to find actual bias. *Id.* at 460. We further

Trial Court:     Okay. And you will be, can you then sit in judgment and treat her like any other person who might take the stand?

Juror Furrow:    Yes. I think I can.

\*   \*   \*

Mr. Shirk:       Okay. Now, you've already told me that Cordia may, knowing that you're on this, or she sees you, she's going to be testifying, the prosecutor tells us she's going to be, she's going to be contacting you about this, you feel.

Juror Furrow:    Yes.

Mr. Shirk:       Does that place, you feel, any heavier burden on you sitting on this case? Do you feel you owe her any duty as a juror in this case? Cordia?

Juror Furrow:    I know she's going to be calling me, you know. I guess I will just listen to both sides. I mean, I don't think that's going to have, one way or another how I would decide my opinion.

Therefore, the record does not support the conclusion reached in the dissent that Furrow had formed an irrefutable belief that Williamson's son had been raped and that she "showed a predisposition to reject the entire defense." In light of the facts of this case, we are not compelled to find that Furrow was presumptively or actually biased against Petitioner.

Miller contends that this case is analogous to *Williams*, in which the United States Supreme Court held that the Virginia Supreme Court's decision that counsel was constitutionally effective was both contrary to and an unreasonable application of clearly established law. The Virginia Supreme Court rejected the opinion of the trial court that Williams,

she did not share a particularly close relationship with Williamson.

Unlike the jurors in *Wolfe*, Furrow possessed very little knowledge of the case as the result of her prior contact with Williamson. Williamson only told Furrow over the phone that her son had been raped and provided no further details. In his dissent, Judge Martin contends that the quantity of information passed from Williamson to Furrow was irrelevant under the *Wolfe* decision. We disagree. In *Wolfe*, this Court considered that the second juror's husband "had spoken with the victim's parents about what they thought had happened when their son was killed, information that he related to her at some length." *Wolfe*, 232 F.3d at 502. Clearly, the source, subject matter and quantity of information were all pertinent factors in evaluating juror bias. In this case, for example, if Williamson had given Furrow a thorough account of the who, what, when and where of the alleged rape, Furrow would likely have experienced more difficulty separating what she was told by Williamson from the evidence presented at trial. In addition, while the information Furrow received went to an ultimate fact of the case, i.e., whether Williamson's son had been raped, Furrow indicated during *voir dire* that she did not necessarily assume that what Williamson told her was true.

> Trial Court:   Okay. Let me, let me try to cut to the heart of this. That what we want to know from every juror is can they put aside their contact with people because in this size county, everybody's going to have some contact with the parties. And base their judgment on what they hear in the courtroom and what the law, the Court gives to you.
>
> In other words, because you heard this from your client, you don't necessarily assume that it's true. Is that correct?
>
> Juror Furrow:   Correct.

concluded that counsel's failure to respond to the juror's express admission of bias on *voir dire* was objectively unreasonable under *Strickland*. *Id.* at 462.

This case presents facts far different from *Hughes*. In this case, the trial court held a separate *in camera* examination of Juror Furrow when she indicated that she had some prior knowledge of the case by virtue of her employment but did not wish to discuss it in open court due to client confidentiality concerns. During the *in camera* examination, Furrow was questioned by the court, the prosecutor, and defense counsel regarding her relationship with Williamson, her contact with Williamson regarding this case, her specific knowledge of the case, and whether she could be fair and impartial. Furthermore, unlike the juror in *Hughes*, Furrow never stated that she could not be fair. While Furrow expressed some discomfort about sitting on the jury, she consistently answered that she could be fair. Therefore, in light of the evidence presented in this case, we are not constrained to make a finding of actual bias based upon the undisputed statement of a juror that she could not be fair in deciding the case.

In another case decided by this Court, *Wolfe v. Brigano*, 232 F.3d 499 (6th Cir. 2000), the petitioner claimed that the trial court violated his Sixth Amendment right to an impartial jury when it refused to remove four biased jurors for cause. The first juror had an ongoing business relationship with the victim's parents. He had talked to the victim's parents and "listened to them" and did not believe that he could be fair and impartial. *Id.* at 502. The second juror stated that she could be fair and impartial, but disclosed that she and her husband were "close friends" of the victim's parents, whom they visited "quite a bit." Furthermore, the victim's parents had discussed with her husband what they thought took place when their son was killed, and her husband later related that information to her at some length. *Id.* The third juror had read and listened to media accounts of the crime and doubted whether she could put aside those reports and decide the case based upon the evidence presented at trial. *Id.* at 502-503.

The fourth juror that the petitioner challenged expressed doubt that he would require the prosecution to prove its case beyond a reasonable doubt. *Id.* at 503.

With regard to the first two jurors, who are the most relevant for purposes of this case, we found that the jurors were biased and should have been excused for cause due to their "close and ongoing" relationships with the victim's parents coupled with their knowledge of the case obtained from the victim's parents. *Wolfe*, 232 F.3d at 502. Neither of the jurors stated unequivocally that he or she could decide the case fairly notwithstanding the relationship with the victim's parents. *Id.* The first juror admitted that he did not think he could be fair and impartial. The second juror stated that she could be fair and impartial, but we found her assessment inconceivable considering her close relationship with the victim's parents and the fact that she was aware of the family's theory of the victim's death. *Id.* Given the facts of that case, it was not sufficient that the trial court was ultimately able to extract the juror's tentative statements that they would try to be fair and impartial. *Id.* at 503.

In this case, it is undisputed that Furrow had an ongoing professional relationship with the victim's mother as her welfare caseworker; however, there is no evidence that the relationship was so "close" that bias must be presumed. The record does not support the dissent's assumption that *all* relationships between welfare caseworker and their client are "close." Welfare caseworkers have dozens, if not hundreds of clients. When asked by the trial court during *voir dire* whether she could face Williamson after rendering a not guilty verdict, Furrow responded without equivocation, "Oh, I can face her, yeah." Furrow also stated that she could have Williamson transferred to another caseworker if a problem developed as a result of her presence on the jury. Her responses were not indicative of a friendship or strong personal bond with Williamson, or an inability to put their professional relationship aside during the trial.

The Petitioner and the dissent argue that Furrow never unequivocally stated that she was unbiased. Yet, during the *in camera* examination, the following exchanges took place:

| | |
|---|---|
| Prosecutor: | – for the record? Do you believe then as a result of being told what happened and it being a close enough connection to probably being this particular case, that you couldn't be fair as a juror? |
| Juror Furrow: | I – it's tough. I think I could be fair. She may be uncomfortable, I feel, being up there knowing that I'm on the jury. I don't know. |

\* \* \*

| | |
|---|---|
| Mr. Shirk: | What I'm asking you is does that lend any more credence to these particular charges against my client, recognizing that the State does have, the State does have the burden of proving that they actually occurred? |
| Juror Furrow: | No, I don't really think that I would be biased. Just uncomfortable. |

These are not equivocal responses from the typical venire person. Many, if not most, jurors respond to questions about their ability to be fair and impartial in the same manner as Furrow – they assert their personal beliefs that they are unbiased, but leave it to the judge to make the final determination. In other words, venire members commonly couch their responses to questions concerning bias in terms of "I think." Therefore, the use of such language cannot necessarily be construed as equivocation. Taking the above statements in context with the other statements made by Furrow during *voir dire*, the trial court cannot be faulted for not disqualifying for cause a juror who consistently says that she thinks she can be fair. Moreover, Furrow's assessment that she could be fair is plausible in light of the evidence that