IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 6, 2021

## RICO HUEY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 12-03675        Glenn Ivy Wright, Judge

_____

### No. W2020-00928-CCA-R3-PC
_____

Rico Huey, Petitioner, filed a pro se petition seeking post-conviction relief from his 2016 aggravated robbery conviction. Appointed counsel filed an amended petition. Following an evidentiary hearing, the post-conviction court denied relief. After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Shae Atkinson, Memphis, Tennessee, for the appellant, Rico Huey.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Amy Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Procedural and Factual History

Petitioner and Karloss Thirkill were convicted by a jury in 2016 of aggravated robbery. This court affirmed the convictions in a joint appeal. *State v. Karloss Thirkill and Rico Huey*, No. W2016-00335-CCA-R3-CD, 2017 WL 3234365, at *1 (Tenn. Crim. App. July 28, 2017) *perm. app. denied* (Tenn. Nov. 20, 2017).

On July 6, 2018, Petitioner filed a pro se post-conviction relief petition raising numerous grounds. On July 30, 2019, appointed counsel filed an amended petition claiming that Petitioner was entitled to specific performance of an oral contract he made with the State during pretrial negotiations and raising numerous grounds of ineffective

assistance of counsel. Following a hearing, the post-conviction court filed a written order on June 11, 2020, addressing each of the grounds raised in the petition on which proof was presented and denying post-conviction relief. Petitioner filed a timely notice of appeal.

Petitioner has only appealed the denial of two of his post-conviction claims. First, he claims that "trial counsel was ineffective in failing to bring to the trial court's attention that [Petitioner] had a deal in place where he wasn't supposed to proceed to trial[.]" Second, he claims that "trial counsel was ineffective for failing to remove jurors from the jury pool that saw an altercation between [Petitioner] and his mother." We will, therefore, limit our discussion of the evidence presented at the post-conviction hearing to that having a bearing on those two claims.

### Post-Conviction Hearing

Assistant District Attorney General Pamela Diane Fleming Stark testified that, in 2010, she was the division leader assigned to Criminal Court Division 1 and that Assistant District Attorney Muriel Malone was assigned to prosecute Petitioner's aggravated robbery case. General Stark was called into the office of Deputy District Attorney General Jennifer Nichols. General Nichols explained that Petitioner had contacted the Memphis Police Department ("the MPD") asking to speak with them and that, when the MPD informed Petitioner that he should have trial counsel contact them, Petitioner said that he did not want trial counsel involved. General Stark said that Petitioner's desire not to involve trial counsel raised a "red flag" and that both she and General Nichols were concerned because Petitioner had "some gang affiliation." General Stark explained that she and General Nichols "wanted to make sure [trial counsel] wasn't a gang attorney and that [trial counsel] was actually representing [Petitioner's] interest." General Nichols asked General Stark to speak with Petitioner for the limited purpose of finding out "why he did not want [trial counsel] involved." General Stark said that she had a "very short" conversation with Petitioner for that purpose and that Petitioner told her that what he wanted to speak to law enforcement about "didn't have anything to do with" his pending case. She said that the District Attorney's office did not refer Petitioner to the MPD and that Petitioner did not tell her what he wanted to speak to the MPD about.

General Stark testified that, after the meeting, every time Petitioner was brought into court "he was either mouthing things to [her] or making hands gestures to [her]." She said that, after trial counsel left the courtroom, she asked to address the court. After the last case on the docket was concluded, Petitioner was brought back into court, and with a court reporter present, General Stark explained what had occurred in the meeting with Petitioner, and Petitioner confirmed that he had asked to speak to the police about something that had nothing to do with the pending case.

General Stark said that it was her "understanding" that Petitioner "actually went to the U.S. Attorney's office and [Petitioner] was given the option of that kind of letter or being paid" and that Petitioner "thought he was going to beat the [aggravated robbery] case so he asked for cash[.]" She said that she was not involved with the negotiations involving the U.S. Attorney. General Stark said that she learned for the first time that Petitioner claimed that there was a deal in place with the State when Petitioner raised the issue in his motion for new trial. She stated that she testified at the hearing on the motion for new trial and that, as far as she knew, there was never any deal with the State.

Trial counsel testified that she was appointed to represent Petitioner. She said that she received discovery from the State and went over it with Petitioner. Trial counsel could not recall whether there were any settlement offers from the State, whether she discussed the risk of going to trial versus pleading guilty, what the defense was at trial, or what the overall theory was for the case. She was not sure whether Petitioner told her that General Stark offered to assist him with the case or whether he told her he had a deal with the State. Trial counsel did not recall any issue in the hallway between Petitioner and his mother. Trial counsel recalled that Petitioner had spoken with federal agents, but she could not recall how she came to learn that information. She first heard about Petitioner having been paid by the federal government during the post-conviction hearing.

On cross-examination, trial counsel was asked about a ten-year offer on the aggravated robbery case and a consecutive six-year offer on another case made by the State. She said that "[i]t sound[ed] familiar."

Petitioner testified that trial counsel represented him in four separate criminal cases. He said "[f]rom the jump [he] didn't want any deal, [he] didn't want any offer. It was give [him] a trial as speedy, as soon as possible[.]" He said that he was acquitted by the jury in separate trials of the other three cases. He said that he met with trial counsel and reviewed the discovery in the aggravated robbery case and that the only offer from the State was eight years at eighty-five percent which was made on the day of trial. He discussed the offer and the risks he faced in a jury trial with trial counsel, and the decision to reject the offer "was totally up to him."

Petitioner said that he was "caught with a large amount of drugs and cellular phones" while in the Shelby County Jail and that he was told that federal agents were going to charge him, so the "[o]nly thing [he] could do was make a deal." He agreed to provide information to the Federal Bureau of Investigation ("the FBI") about the officers that were bringing "drugs and stuff" into the jail, and in exchange, "they would dismiss the [federal] charges." He also claimed that "in return [the FBI] would holler at" the District Attorney's Office and try to get him a deal on his pending state case.

Petitioner said that he spoke with General Stark in a back room at the courthouse. He said that he was in court for a hearing and that, after trial counsel left, he asked General Stark if he could speak with her. Petitioner claimed that General Stark said that she would rather discuss things with Petitioner alone because trial counsel "was a b**** and she didn't want to deal with her" and that "if you and me can work this out, we can go from there." He said that General Stark told him that, if he would "continue to do what [he] was doing," he would be sentenced to community corrections or probation. He said that, at the time he spoke to General Stark, he had been incarcerated for three years. He said that no one else was present during his conversation with General Stark and that he never signed any paperwork. He claimed that he told trial counsel about working with the FBI about a month before the courthouse meeting with General Stark. Petitioner denied that he "reached out" to or called the MPD.

Petitioner said that he provided information to the FBI for about a year and that ultimately five officers at the jail were convicted and the federal charges against him were dismissed. He said that he received cash from the FBI "in order to put money on his books for commissary and phone calls, but he never received anything outside of that." According to Petitioner, FBI Agent William Masters and his partner, only identified as "Little Rob," were supposed to speak with Division 1 Criminal Judge Paula Skahan and to General Nichols and that "all [he] had to do [was] just show up at court" and the FBI would "take care of everything behind the scene." His understanding was that he would never have to go to trial on the state charge. Petitioner said that, on the day of his trial, he was expecting the State to have him sign some papers and release him but that, instead, the State offered him a plea agreement of eight years at eighty-five percent.

Petitioner said that, after being found not guilty on the other cases, he was released on bond in this case for about a year before his trial. Petitioner claimed that, as he was getting ready to come into the courtroom for trial, he had an argument with his mother and that he "kind of said some heated words of going back and forth not knowing that the jury pool was adjacent to [them]." He said that trial counsel raised the issue with the trial court and that the jury venire was questioned about the incident. He said that "a couple of people got up and stated they still feel they could be on the case without showing any bias and it wasn't really going to affect their judgment but [he] still fe[lt] like it weighed in on it." He thought that "the foreman and another elderly lady" on the jury witnessed the argument.

On cross-examination, Petitioner said that he was never actually charged in federal court with the drugs found in the jail. He said that the threat to charge him "was just a scare tactic to get [him] to cooperate." Petitioner said that he told trial counsel when he came to court for his trial that he had "a deal in place with the State [and] they're not suppose to be trying [him]." He said that trial counsel did not bring the issue up until the motion for new trial. Petitioner claimed that FBI Agents Masters and "Little Rob" came

- 4 -

to state court on several occasions when his case was set. He said that he saw them speak to General Stark or General Malone.

Petitioner said that, after he was convicted in this case and sent to prison, he contacted the FBI and was told that he "got a bad handshake" and that "they dropped the ball." He said that the FBI said they were "really sorry" that they could not get his "state case fixed" and that they would put three thousand dollars "on [his] books" at the prison. Petitioner said that he told trial counsel that he was talking to the FBI before his meeting with General Stark. Petitioner said that he had been stabbed three times in prison because of the information he supplied to the FBI.

Trial counsel was recalled and said that some of Petitioner's statements "rang true" but that she did not "have an independent recollection of it." She said that, after listening to Petitioner's testimony, she did recall an FBI agent approaching her at one of Petitioner's trial dates and "saying they were trying to work out something."

The post-conviction court took the matter under advisement.

## Order Denying Post-Conviction Relief

On June 11, 2020, the post-conviction court issued a thorough order, in which it addressed six issues on which proof was presented, including the two ineffective assistance of counsel claims preserved on appeal, and denied post-conviction relief.

### Failing to Bring Petitioner's Deal to the Attention of the Trial Court

The post-conviction court noted that Petitioner claimed that trial counsel was deficient for failing to force the State to honor the purported agreement for leniency and for failing to raise that issue before starting the jury trial. The court also noted that Petitioner testified that he tried to bring the issue before the trial court. The post-conviction court reviewed the transcript of the Petitioner's aggravated robbery trial and found that "the transcript of the proceedings indicate that no such attempt was made."[1] The post-conviction court also found that it was Petitioner who wanted to keep his conversations private from trial counsel and that there was no proof of ineffective assistance of counsel presented. The post-conviction court found that Petitioner failed to prove that an agreement actually existed between the State and Petitioner. The post-conviction court found that Petitioner lacked credibility and determined that the issue had no merit.

---

[1] The judge in the post-conviction proceeding also presided over Petitioner's trial.

- 5 -

*Failing to Remove Jurors*

The post-conviction court noted that Petitioner testified that trial counsel raised the issue in the trial court, that potential jurors were questioned, and that two jurors, who were ultimately empaneled for his trial, stated that they heard the argument between Petitioner and his mother but that they would not be influenced by what they heard. The court found that Petitioner failed to show any prejudice.

## Analysis

To prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. To receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove both: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). To prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). To prove the second prong of *Strickland*, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a court determines that either

factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007).

*Failing to Bring Petitioner's Deal to the Attention of the Trial Court*

Petitioner claimed that trial counsel was deficient for failing to force the State to honor the purported agreement for leniency and for failing to raise that issue with the trial court before starting the jury trial. Petitioner claimed that he tried to bring the issue before the trial court; however, the post-conviction court found that "the transcript of the proceedings indicate that no such attempt was made." The court found that Petitioner failed to prove that an agreement actually existed between the State and Petitioner. The court also found that it was Petitioner who wanted to keep his negotiations with the FBI secret and to not involve trial counsel. The post-conviction court found that Petitioner lacked credibility. "[F]actual findings and credibility determinations" made by the post-conviction court are binding on this court "unless the evidence in the record preponderates against them." *Kendrick* 454 S.W.3d at 479. The evidence in the record does not preponderate against the post-conviction court's findings. The post-conviction court concluded that Petitioner failed to prove that trial counsel's performance was deficient or that the assistance trial counsel provided was ineffective. We affirm the post-conviction court's conclusion that the issue merits no relief.

*Failing to Remove Jurors*

"Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense." *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir. 2001); *William Glenn Rogers v. State*, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *35 (Tenn. Crim. App. Aug. 30, 2012) *perm. app. denied* (Tenn. Dec. 11, 2012). "In order to prevail on a claim of ineffective assistance of counsel based on deficient voir dire, a petitioner is required to prove that the deficiency resulted in having a juror seated who was actually biased." *Smith v. State*, 357 S.W.3d 322, 348 (Tenn. 2011). The potential jurors in this case were questioned during voir dire about the argument Petitioner had with his mother. According to Petitioner, two of the jurors who served on the trial jury indicated that they overheard the argument. However, both jurors testified that they would not be influenced or biased by what they heard. Petitioner has failed to show that trial counsel was deficient during jury selection and has failed to demonstrate that the resulting jury was biased or that the jury was not impartial. Petitioner is not entitled to relief.

**Conclusion**

We affirm the judgment of the post-conviction court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE