[Cite as *State v. Bach*, 2013-Ohio-3412.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

STATE OF OHIO,                                          :

    Plaintiff-Appellee,                          :               CASE NO.   CA2012-11-121

    - vs -                                               :               O P I N I O N
                                                             8/5/2013

                                                         :

TERRY L. BACH, JR.,                                    :

    Defendant-Appellant.                         :

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 12CR28042

David P. Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Thomas G. Eagle, 3386 N. State Rt. 123, Lebanon, Ohio 45036, for defendant-appellant

**RINGLAND, P.J.**

{¶ 1}   Defendant-appellant, Terry L. Bach, Jr., appeals his conviction for robbery from the Warren County Common Pleas Court.

{¶ 2}   The Dollar Tree Store in Franklin, Ohio was robbed on April 19, 2011, around 8:18 p.m.  Subsequently, two acquaintances of Bach told police that Bach had admitted to the crime.  On February 13, 2012, Bach was indicted and charged with robbery in violation of R.C. 2911.02(A)(3), a felony of the third degree.

{¶ 3} The matter was tried to a jury. After hearing the evidence, the jury convicted Bach of robbery. Bach moved for a judgment of acquittal or, in the alternative, a new trial. The trial court denied Bach's motion and sentenced him to serve 18 months in prison.

{¶ 4} Bach now appeals that conviction, raising two assignments of error for our review. Additional facts will be discussed as necessary under the relevant assignments of error.

{¶ 5} Assignment of Error No. 1:

{¶ 6} THE TRIAL COURT ERRED IN CONVICTING THE APPELLANT OF ROBBERY.

{¶ 7} Within this assignment of error, Bach raises two issues for our review: (1) "[a] conviction for Robbery is against the manifest weight of the evidence when the disputed issue at trial is the defendant's identity as the offender, the defendant does not meet material characteristics of the offender, the only evidence and statements of other convicted criminals given in exchange for favorable treatment that the defendant admitted to the offense, and credible evidence is presented contrary to concluding the defendant was the offender"; and (2) "[a] conviction results from ineffective assistance of trial counsel when that counsel fails to effectively examine jurors and witnesses and present evidence in a manner that supports the defendant's case and failed to present material defense witnesses."

*1. Manifest Weight of the Evidence*

{¶ 8} Bach first argues that his conviction was against the manifest weight of the evidence.

{¶ 9} In determining whether a conviction is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest

miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Roark*, 12th Dist. Warren No. CA2012-04-036, 2013-Ohio-217, ¶ 46.

{¶ 10} At the time of the robbery, there were two employees on duty at the Dollar Tree, Matthew Christian and Ryan Willis. Christian testified that he observed a man wearing a hooded sweatshirt with the hood up and tied around his face. Christian stated that the suspect was a male, but he was unable to tell whether he was black or white. He described the suspect as between 5'11" and 6'0" tall, weighing between 160 and 170 pounds, and approximately 30 years old. After the suspect received the money, Christian saw him unsuccessfully attempt to exit the store through the entrance door, then exit the store through the proper door and head toward the right. Christian then called 911, indicating that he believed the suspect was armed because he kept his right hand in his pocket and appeared to point something he believed to be a weapon at Willis. In a subsequent photo lineup, Christian was unable to identify anyone as the suspect.

{¶ 11} Willis, who was working as a cashier on the date in question, testified next. Willis testified that he saw the suspect approach him with his hands inside his sweatshirt and most of his face covered by the hood. Willis described the suspect's attire as a gray sweatshirt on top of a plaid coat with a red t-shirt underneath, along with jeans and boots. The suspect told Willis to "let me get that money," after which he motioned to his pocket and stated that there were a lot of people in the store and that Willis didn't want to see anyone get hurt. After giving the suspect the money, Willis also saw the suspect attempt to leave through the wrong door, then exit and run toward the right. Willis testified that he is 6'1" and that the suspect seemed taller than himself. Willis estimated that the suspect was between 160 and 200 pounds, but seemed thin based on his gaunt face. He further testified that the suspect had a few days growth of dirty blonde stubble on his face. Willis also participated in a photo lineup, but was unable to identify anyone with certainty.

{¶ 12} Next to testify was James David Banks, an acquaintance of Bach from high school. Banks had been released from jail on April 22, 2011, following an arrest for an OVI. Upon release, Banks testified that he encountered Bach. Banks stated that he and Bach spoke, whereby he asked Bach if he could get a ride back to Franklin with him. According to Banks, the two men went and bought a six-pack and drank the beer while they waited for Bach's father to pick them up. Banks testified that while they were drinking, Bach told him he had robbed the Dollar Tree and indicated he was eager to return to Franklin to retrieve the stolen money that he had hidden in the roots of a tree on a creek bank behind the Beam Apartments. Banks testified that the Beam Apartments were a short distance from the Dollar Tree. Banks stated that Bach's father then picked them up and drove them to the Beam Apartments. Per Banks, Bach told his father he had stashed money there. Upon stopping at the apartments, Banks stated that Bach went into a wooded area and returned with a handful of "dirty and watery" money.

{¶ 13} Approximately two weeks later, Banks contacted the Franklin Police Department about the Dollar Tree robbery. Banks testified that he not heard or read about the robbery prior to contacting the police. On May 4, 2011, Banks spoke with Detective Figliola and told him what he had seen and heard. Banks testified that he had no reason to fabricate his story, and that Detective Figliola had not promised him anything in return for his testimony. Detective Figliola did tell Banks he would recommend that Banks' OVI be dismissed, but Banks was convicted of that offense prior to the trial. Finally, Banks testified that he did not know anyone named John Hall, who was to testify next.

{¶ 14} Hall testified that he was friends with Bach and knew his father, having worked for him. Hall stated that Detective Scott Brown, purportedly a friend of Hall, asked if Hall had any information regarding the robbery, presumably because of Hall's criminal background. Hall responded in the affirmative, and thus was interviewed by Detective Figliola. Hall stated

that he had spoken with Bach, and that Bach had admitted to robbing the Dollar Tree in Franklin. Hall said that Bach told him he had tied a 'hoodie' around his face, and was wearing jeans and booted shoes at the time. According to Hall, Bach told him that he took the money, ran behind the Beam Apartments and hid his clothes and money there. He then allegedly told Hall that he went and stole a beer from a nearby convenience store in his underwear in order to establish an alibi. Hall testified that he had not seen or heard anything regarding the robbery prior to speaking with the police. He further stated that he did not know Banks. Hall did testify that his girlfriend was in Middletown jail and unable to be released due to an arrest warrant for a theft charge. Hall stated that he asked Detective Brown to get a court date set for his girlfriend so that she could leave the jail rather than wait there. He testified that Brown was able to do this for him, but that his girlfriend was subsequently convicted on the theft charge.

{¶ 15} Detective Figliola was responsible for investigating the Dollar Tree robbery. He testified that he dusted the countertop for fingerprints but found none of value. He was able to retrieve a palm print from the entrance door Bach unsuccessfully attempted to exit, but the print did not match that of Bach. Detective Figliola testified that as of April 19, 2011, Bach was 6'0 tall, weighed 155 pounds and was 32 years old. He confirmed the earlier testimony of Christian and Willis that he presented them with photo lineups, but that they were unable to make any identification. Detective Figliola testified that after speaking to Banks, he checked Banks' release date from Warren County Jail and found that he and Bach were released five minutes apart on the same day. He testified that he also interviewed Hall, and found no connection between Hall and Banks. Finally, Detective Figliola testified that Bach was arrested on April 19, 2011, for stealing beer from the Circle K convenience store. He testified that Bach was arrested in the parking lot of the Strike Zone wearing boxers and a blue shirt. He further testified that the Strike Zone is near the Dollar Tree and Beam

Apartments.

{¶ 16} In his defense, Bach called his father to the stand. His father testified that, on April 19, 2011, he was working at a rental house in Franklin with Bach's girlfriend and others. He testified that Bach's mother brought Bach to the rental house at 7:30 p.m. Bach's father said that he and Bach left the rental house at 8:00 p.m. and drove to his house in Kettering, approximately 15-20 minutes away. He stated that they arrived at his home at 8:30 p.m., after which Bach changed his clothes and left. Bach's father said that he later saw Bach with Jamie Wheeler, who was to testify next. Bach's father testified that he drove Bach back to Franklin around 10:00 p.m. Bach's father testified that he picked up Bach and Banks a few days later at a convenience store in Lebanon. Bach's father admitted that he drove Bach to the Beam Apartments, but stated that it was to retrieve a bicycle. Finally, he asserted that he did not see Bach return with any money or clothes, but also that he did not find the bicycle.

{¶ 17} Wheeler, a friend of Bach's, testified that he had dinner with Bach on the night in question. He testified that he met Bach around 8:30 or 8:45 p.m. that night, and was with him until 10:00 p.m.

{¶ 18} Finally, Anthony Norvell testified that he was working at the rental house with Bach's father on April 19, 2011. He said that he saw an older woman drop Bach off at the rental house around 7:30 p.m, and subsequently saw Bach leave with his father. Norvell stated that he was certain it was April 19, 2011, because he had written a receipt for Bach's father on that date. However, on cross-examination, Norvell admitted that he had written Bach's father numerous receipts on other dates, and that the receipt in question did not indicate Bach's presence when it was written. Norvell thus conceded he was not sure about the date he witnessed Bach being dropped off and leaving with his father.

{¶ 19} In the case at bar, the jury had to give weight to and determine the credibility of the conflicting evidence before them. The store employees provided descriptions that were

reasonably accurate in describing Bach. Two acquaintances testified that Bach admitted to committing the crime. The first of those witnesses was confirmed as having been released from jail at the same time as Bach, and having spent time with him subsequently. Those two witnesses testified that they had not heard or read about the crime, other than what Bach had told them, prior to speaking to police. They further testified that they did not know one another, yet their testimony was corroborative.

{¶ 20} In turn, Bach presented witnesses who created an alibi for his whereabouts during the time of the robbery. Bach's father and two of Bach's friends testified that they were collectively with Bach throughout the period from 7:30 to 10:00 p.m.

{¶ 21} The jury heard all of this evidence and convicted Bach of robbery. Although a reviewing court considers the weight of the evidence and the credibility of the witnesses, "that review must nevertheless be tempered by the principle that weight and credibility are primarily for the trier of fact," as the trier of fact is in the best position to "view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wells*, 12th Dist. Warren No. CA2005-04-050, 2006-Ohio-874, ¶ 21, quoting *State v. Kash*, 12th Dist. Butler No. CA2002-10-247, 2004-Ohio-415, ¶ 25.

{¶ 22} In believing the testimony of the state's witnesses rather than Bach's, we cannot find that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

### 2. Ineffective Assistance of Counsel

{¶ 23} Bach next argues that his counsel was ineffective for failing to effectively examine jurors and witnesses and present evidence in a manner that best supported his case.

{¶ 24} To prevail on an ineffective-assistance-of-counsel claim, a defendant must

show that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) he was prejudiced by that deficient performance in that there is a reasonable probability that, but for his counsel's deficient performance, the outcome of his trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-694, 104 S.Ct. 2052 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

{¶ 25} Bach first argues that his counsel was ineffective for failing to attempt to rehabilitate a prospective juror who claimed to be incapable of applying the proper standard of proof. After the juror stated that her Christian beliefs would render her incapable of convicting someone absent "100 percent proof," Bach's counsel chose not to question the juror any further. The juror was then excused by the trial court. Bach fails to articulate how his counsel could have rehabilitated this juror, or how the outcome of the trial would have been different had his counsel made such an attempt. Accordingly, the claim of prejudice is entirely speculative, and we will not second-guess counsel on the decision not to attempt to rehabilitate the juror. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 213.

{¶ 26} Bach also argues that his trial counsel was deficient by failing to utilize all of his peremptory challenges. However, Bach once again fails to explain how the failure to use all of the peremptory challenges gives rise to the reasonable probability that the outcome of the trial would have been different but for that failure. "[W]hen a defendant bases an ineffective-assistance claim on an assertion that his counsel allowed the impanelment of a biased juror, the defendant '*must* show that the juror was *actually biased* against him.'" *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 62, quoting *Miller v. Francis* (C.A.6, 2001), 269 F.3d 609, 616. (Emphasis sic.) Here, Bach apparently alleges that biased jurors were allowed to be impaneled as a result of the failure of his counsel to use all of his peremptory challenges, yet he provides no evidence of any actual bias by those jurors.

{¶ 27} Finally, Bach argues that his counsel was ineffective by failing to properly question witnesses and failing to call additional material witnesses to the stand.

{¶ 28} There is a presumption that the challenged action may be "sound trial strategy" that the defendant must overcome. *State v. Gilbert*, 12th Dist. Butler No. CA2010-09-240, 2011-Ohio-4340, ¶ 72. It is well-established that the scope of cross-examination falls within the realm of trial strategy. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101; *State v. Davis*, 10th Dist. Franklin No. 09AP-869, 2011-Ohio-1023, ¶ 18.

{¶ 29} After a thorough review of the record, we cannot find that Bach's counsel's examination of the two store clerks and Detective Figliola fell below the objective standard of reasonableness. We find that counsel's choice of questions for these witnesses amounted to nothing more than defense strategy and tactic. Debatable trial tactics and strategies do not constitute ineffective assistance of counsel. *State v. Curtis*, 12th Dist. Brown No. CA2009-01-004, 2009-Ohio-6740, ¶ 49.

{¶ 30} Nor do we find that Bach's counsel was ineffective in failing to call additional witnesses who would have been merely cumulative to testimony that was already provided. Bach argues his counsel was ineffective in failing to call his mother and stepmother to corroborate his alibi, and in failing to present documentation to support the testimony of Norvell. However, the testimony of Bach's mother and stepmother would have been merely cumulative to that of Bach's father and Norvell. In addition, the production of documentation to support Norvell's testimony that he gave Bach's father a receipt on the date of the crime would have been irrelevant as it was uncontested that a receipt was given on that date. The relevant question presented by the state was how a receipt given to Bach's father on that date would prove that Bach was also there at the time. Production of the receipt would have done nothing to answer that question. As further explained infra, we cannot find that Bach's counsel was ineffective for choosing not to call additional witnesses that would provide

merely cumulative or irrelevant evidence.

{¶ 31} In light of the foregoing, having found that Bach's conviction was not against the manifest weight of the evidence, that Bach's trial counsel was not ineffective in examining jurors or witnesses and in presenting evidence, Bach's first assignment of error is overruled.

{¶ 32} Assignment of Error No. 2:

{¶ 33} THE TRIAL COURT ERRED IN DENYING THE MOTION FOR NEW TRIAL.

{¶ 34} Within this assignment of error, Bach raises two issues: (1) "[a] Motion for New Trial should not be denied without a hearing when the motion is supported by affidavits and circumstances that a hearing could resolve the Motion in the defendant's favor"; and (2) "[a] Motion for New Trial should not be denied when the motion is supported by affidavits and circumstances that: 1) material evidence important to the defense was available and not presented only due to error of trial counsel; and 2) new witnesses were discovered after the trial that one of the state's witnesses that was crucial to the conviction had lied about his testimony."

### 1. Hearing

{¶ 35} Under the second assignment of error, Bach first argues that the trial court erred in failing to hold a hearing on the motion for a new trial.

{¶ 36} The decisions whether to grant a motion for a new trial or hold an evidentiary hearing on the motion are committed to the trial court's sound discretion, and the trial court's decision will not be reversed absent an abuse of discretion, i.e., the decision is arbitrary, unconscionable or unreasonable. *State v. Brakeall*, 12th Dist. Fayette No. CA2008-06-022, 2009-Ohio-3542, ¶ 9, citing *State v. Hessler*, 90 Ohio St.3d 108, 122-124 (2000).

{¶ 37} Bach argues that the trial court erred in denying the motion for a new trial where new witnesses were discovered who would discredit the testimony of one of the state's witnesses. In order to prevail on a motion for a new trial based upon newly-discovered

evidence, the defendant must establish that the evidence:

> (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. *State v. Petro*, 148 Ohio St. 505 (1947), syllabus.

{¶ 38} The only new evidence discovered since the trial which Bach introduced in his motion for a new trial was the affidavit of Robert LaSeur. In his affidavit, LaSeur stated that he was in jail with Hall, and that Hall told LaSeur that "him and another person came up with the story to get themselves out of trouble. And that the detectives were pressuring him to make a statement against [Bach]."

{¶ 39} However, as the trial court correctly noted, this evidence is not new, but rather cumulative to that of Justin Smith and Mark Sweeney, both of whom were available to testify at trial. In addition, the state presented the affidavit of Lt. Jeffrey Ryan, W.C.S.O., who stated that his review of jail records found that LaSeur would not have had the opportunity to interact with Hall. Therefore, even if LaSeur's statement were considered in a new trial, it is unlikely that it would result in a change in the outcome. Accordingly, we cannot find the trial court abused its discretion in refusing to hold an evidentiary hearing and denying Bach's motion for a new trial on the basis of newly discovered evidence.

### 2. Ineffective Assistance of Counsel

{¶ 40} The remainder of Bach's arguments under his second assignment of error allege that his counsel was ineffective by failing to present material evidence at trial.

{¶ 41} As stated above, to prevail on an ineffective assistance of counsel claim, a defendant must show that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) he was prejudiced by that deficient performance in that there is a reasonable probability that, but for his counsel's deficient

performance, the outcome of his trial would have been different. *Strickland*, 466 U.S. 668, 687-694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

{¶ 42} Bach's motion for a new trial contains many attached affidavits of witnesses he claims his counsel was deficient in failing to call. First is the affidavit of JoAnn Bach, Bach's stepmother, whereby she stated that she would have testified that she witnessed Bach's father return to their home in Kettering with Bach at 8:30 p.m. on the night of the robbery, after which Bach went to a friend's house until 10:00 p.m. and then left again. There are also affidavits from Marsha Darner, Bach's mother, who attested to having seen Bach at the rental property at 7:30 p.m., and Patty Illerton, who attested to having seen Bach at the rental property at 8:00 p.m. on the night of the robbery. However, all of this alibi testimony would have been merely cumulative to the trial testimony of Bach's father and Norvell.

{¶ 43} In Norvell's affidavit, he states that he provided Bach's counsel with a receipt that was written and dated April 19, 2011, and would have verified the date that he claims to have seen Bach at the rental property with Bach's father. We find that the receipt would have been irrelevant and redundant to Norvell's testimony. The state's impeachment of Norvell's testimony did not question the existence of the receipt for that date, but rather questioned the fact that Norvell has written Bach's father numerous receipts, and that the April 19, 2011 receipt does not note or indicate Bach's presence. Therefore, regardless of whether Norvell had a receipt dated April 19, 2011, he was unable to say with certainty that Bach was with his father on that specific date.

{¶ 44} Regarding the affidavit of Justin Smith, who asserted that Hall told him he had written a false report against Bach, it appears that Bach's counsel indicated to Bach that he believed there would be questions as to Smith's involvement in the robbery. Combined with Smith's personal relationship with Bach, there were clearly potential questions as to his

credibility if he were to testify. Finally, there was the affidavit of Mark Sweeney, who claimed that he spoke with Hall in jail. He stated that Hall told him he had only made the statement against Bach in order to get out of jail early. However, the affidavit of Lt. Ryan indicates that it is unlikely Hall and Sweeney had contact while in jail, and therefore brings his credibility into question.

{¶ 45} Each of the affidavits attached to the motion for a new trial presents either redundant, cumulative evidence, or testimony that Bach's counsel may have found to be too untrustworthy to be beneficial to his client and therefore strategically decided not to use. Accordingly, we cannot find that Bach's counsel's decision not to use the witnesses or testimony described in the affidavits was deficient performance below an objective standard of reasonableness, nor that it's reasonable to believe that the outcome of the trial would have been different but for his counsel's performance.

{¶ 46} In light of the foregoing, having found that Bach did not present any new evidence in his motion for a new trial that was not cumulative to evidence available at the time of trial, and having found that his counsel's performance was not below the objective standard of reasonableness, nor would the outcome of the trial have likely been different but for his performance, Bach's second assignment of error is overruled.

{¶ 47} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.